AMANDA N. LISKAMM
Acting Director
WEI XIANG
MEREDITH B. HEALY
Trial Attorneys
U.S. Department of Justice
Consumer Protection Branch
PO Box 386
Washington, DC 20044
Tel: (202) 532-4140; Fax: (202) 514-8742
wei.xiang@usdoj.gov
meredith.b.healy@usdoj.gov

JASON M. FRIERSON
United States Attorney
Nevada Bar Number 7709
MINA CHANG
Assistant United States Attorney
United States Attorney's Office
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
Tel: (702) 388-6336
Fax: (702) 388-6787
mina.chang@usdoj.gov
*Attorneys for the United States of America*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:21-cr-00235-APG-EJY |
| Plaintiff, | **Government's Sentencing Memorandum** |
| v. | |
| HAROLD DAVID SOBEL, | |
| Defendant. | |

Defendant Harold David Sobel played crucial supporting roles in a years-long conspiracy to steal money from American consumer bank accounts. Although he did not directly cause the theft, nor organize the scheme, his lies to banks and victim-complainants

helped perpetuate the scheme's success. Given his criminal history both before and after his participation in the instant offense, he merits a sentence within his advisory sentencing guidelines range.

## I. SENTENCING STANDARD

Title 18, Section 3553(a) of the United States Code lays out the factors the Court should consider when imposing a sentence. They include:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

    (A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

    (B) to afford adequate deterrence to criminal conduct;

    (C) to protect the public from further crimes of the defendant; and

    (D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3) the kinds of sentences available;

(4) the kinds of sentence and the sentencing range established [under the Sentencing Guidelines];

(5) any pertinent policy statement [issued by the Sentencing Commission];

(6) the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct; and

(7) the need to provide restitution to any victims of the offense.

18 U.S.C. § 3553(a). "District courts must determine in each case what constitutes a sentence that is sufficient, but not greater than necessary . . . to achieve the overarching

sentencing purposes of retribution, deterrence, incapacitation, and rehabilitation." *Rosales-Mireles v. United States*, 138 S. Ct. 1897, 1903 (2018) (internal quotation marks and citations omitted).

## II. DISCUSSION

**A.  Defendant's Sentencing Guidelines Range is 57 to 71 Months.**

As correctly calculated in the Presentence Investigation Report ("PSR"), the adjusted offense level for defendant's crime under the Sentencing Guidelines is 27. PSR at ¶ 29. After acceptance of responsibility adjustments, his total offense level is 24. *Id.* at ¶ 33. The PSR also correctly calculates his Criminal History Category as II. *Id.* at ¶ 39. Accordingly, his advisory guidelines range is 57 to 71 months imprisonment. *Id.* at ¶ 75.

**B.  A Custodial Sentence of 57 Months is Appropriate.**

The plea agreement between the government and defendant contemplated that the government would recommend a sentence within the range calculated by the Court. For the reasons discussed below, defendant merits a sentence at the low end of his range.

### 1. The nature and circumstances of the offense.

The offense for which defendant will be sentenced was a serious and sophisticated fraud scheme. It stole millions of dollars from the bank accounts of unwitting American consumers by falsely representing to banks and other third parties that the consumers had subscribed to some service or product, such as computer cloud storage, and authorized their accounts to be debited by shell entities controlled by scheme participants. To cover their trails and continue the scheme, conspirators took multiple measures, including "micro" debits with which the conspirators sought to hide the volume and percentage of unauthorized victim debits. As defendant explained to his arresting investigators, the micro debits served to "offset" the victim debits that returned (that is, debits that were charged

3

back as unauthorized or for administrative reasons, including nonsufficient funds or account closed). Defendant further explained, "If your return level goes above a certain percentage, then the bank doesn't want to do business with you. . . . So with these returns or what have you, you need to put through 100 $1 things to offset the two or three $40 things so the percentage of returns stays below a certain level to retain the process in the bank."

Although defendant does not appear to have directly participated in or caused victim debits or micro debits, defendant did play crucial supporting roles for the conspiracy for seven years. First, at the direction of a foreign co-conspirator ("CC-1"), defendant opened bank accounts in the United States for use in the scheme. For example, on or about October 16, 2019, defendant opened four business deposit accounts at a bank branch in Las Vegas, Nevada. Defendant opened the accounts for shell entity "Silver Safe Box" and listed himself as the sole member and authorized signer in the account opening documentation. These Silver Safe Box accounts were then funded and used for micro debits. Between approximately December 2019 and January 2021, the Silver Safe Box accounts funded over 800,000 micro debits in amounts ranging from $0.99 to $1.85. Defendant also recruited at least two associates in the United States to help CC-1, among other things, open bank accounts or register shell entities.

Furthermore, defendant supervised a call center in Ukraine for CC-1. Defendant devised the script by which the call center's personnel were to first try to retain as much of the scheme's criminal proceeds as possible, but to ultimately use full refunds to dissuade complainant victims from reporting the debiting shell entity to the victims' banks and government agencies. Defendant also devised a metric by which defendant and CC-1 could evaluate the effectiveness of the call center's personnel. At times, the call center fielded upwards of one hundred calls a day from victims of numerous shell entities, including Silver

Safe Box. Having earned a "salary" in addition to being paid or reimbursed for expenses incurred during the course of his years-long participation in the conspiracy, defendant merits a custodial sentence commensurate with that participation.

**2.  The history and characteristics of the defendant.**

Defendant's history and characteristics support a substantial custodial sentence. In his sentencing interview with the U.S. Probation Office, defendant insinuated that he was targeted for recruitment into the conspiracy by CC-1 "because of [defendant's] naïve and trusting nature." PSR at ¶ 20. Doubtful. First, defendant was no intellectual lightweight. Having worked as a fraud investigator for an insurance company, a real estate investor, a realtor, a dental laboratory owner, and a timeshare salesman, defendant had an employment history nearly as varied as the number of languages he comprehends. *See* PSR at ¶¶ 65-68.

These life experiences more likely than not contributed to defendant's ability to convince consumer-victims of the scheme to walk away with less money than they were owed, an ability about which he boasted more than once to CC-1. For example, on or about June 1, 2016, defendant bragged in an email to CC-1, "conserved $7,557 in unnecessary refunds in ONE day. wow! … Not bad considering I had no choice but on three very difficult calls (for ME, so you could imagine) to give back refunds to avoid BBB, bank, and DA letters." Similarly, on or about June 9, 2020, defendant sent an email to CC-1 in which defendant expressed doubt about the performance of call center personnel at minimizing refunds, writing, "28 calls with zero refunds? Give me a break! Not possible, unless [the representative] is handing off any losing call going South to another worker. Even I cannot pull off a miracle like that. Very good is 1 refund in 4.8 calls or more." In subsequent emails to CC-1 that same day, defendant commented on the call center personnel's zero refunds,

cautioning, "In the off-chance … [it] isn't bullshit, or manipulation by farming out the loser calls to others for self-glorification, then it is a BIGGER problem, as you well know, than giving away the farm. By giving nothing, it generates nothing but problems in the form of, BBB complaints, and/or DA letters. No one needs these iatrogenic problems." Defendant also criticized what he perceived to be poor performance by the call center personnel, observing, "I know every loophole in existence and how to play with/exploit the system a lot better than the perpetrators EVER will. I didn't work the fraud department of dental insurance companies for nearly 10 years because I was stupid or couldn't smell b.s/overutilization/underutilization, miscoding,,unnecessary [sic] treatment, medicare fraud, etc. a mile away."

      Defendant's post-arrest machinations also belie his self-proclaimed naïveté. As admitted in the factual basis of his plea agreement, defendant made numerous telephone calls from jail to CC-1. In these calls, defendant sought to blackmail CC-1 with extortionate threats of cooperating with the government's investigation unless CC-1 paid a sum of money in bitcoin.[1] Lying to CC-1 about what he had already told the government post-arrest, and inducing the government to offer him a proffer letter (then canceling the proffer), defendant sought to play CC-1 and the government off each other to further his self-interest. This willingness to extort CC-1 shows that defendant was not so naïve, nor subservient to CC-1, as to blindly follow CC-1. Thus, defendant should also not be sentenced as if he were.

---

[1] Defendant's objection to the PSR paragraphs reciting these calls claims that he disagrees with the "meaning, intent and interpretation" set forth by the government of these "cherry picked" excerpts and that "the nature of the dialogue was prone to misinterpretation when taken out of context from the much longer conversations." Defendant, however, advanced no alternative interpretation. The government invites him to do so, so that the Court may be better informed in its interpretation.

In addition to his attempted blackmail of CC-1, defendant also "loaned" over $100,000 to a fellow inmate and others in October 2021. *See* PSR at ¶ 71. Whatever the true circumstances of that arrangement, that fraudsters would double-cross each other is not surprising (nor a sign of naïveté on defendant's part). What it does mean is that defendant had over $100,000 on hand that he did not disclose to Pretrial Services following his arrest, which calls into question the $0 in total assets defendant reported to the U.S. Probation Office during his sentencing interview.

Lastly, defendant already has a prior history with this District. Having been arrested and charged in this District in 1991 for structuring financial transactions, defendant fled the United States. PSR at ¶¶ 37, 43. Approximately 15 years later, he pleaded guilty to failure to appear and was sentenced to time served of 112 days. *Id.* at ¶ 37. Defendant's Criminal History Category of II accounts for this prior conviction and sentence by raising the low end of his guidelines range from 51 to 57 months. Defendant's sentence should likewise account for the fact that this will not be his first sentencing before the Court.

> **3. The need for the sentence imposed to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, to protect the public from further crimes of the defendant, and to provide the defendant with needed rehabilitation.**

A sentence at the low end of the guidelines range here would adequately punish and generally deter similar criminal conduct. If not faced with the prospect of a serious custodial sentence, other would-be perpetrators may be all too willing to enable the theft of American consumers' bank accounts by serving as straw owners of, and opening domestic bank accounts for, shell companies operated and controlled by foreign fraudsters, as defendant did here.

A sentence at the low end of the guidelines range would also be appropriate for specific deterrence of defendant from further crimes. In his sentencing interview, defendant stated that "he intends to pay restitution by becoming successful very shortly." PSR at ¶ 20. Defendant's professed intention to "becom[e] successful very shortly" gives the government pause. Whatever defendant is scheming to make money quickly likely should be deterred. Admittedly, pretrial detention has not fully deterred defendant's machinations. Nevertheless, incarceration's past inability to fully deter defendant does not mean future incarceration would have no deterrent effect.

### III.  CONCLUSION

For the foregoing reasons, the government respectfully requests the Court to impose a custodial sentence of 57 months as the appropriate and just punishment against defendant.

DATED this 7th day of December, 2022.

Respectfully Submitted,

AMANDA N. LISKAMM
Acting Director, Consumer Protection Branch

*/s/ Meredith B. Healy*
WEI XIANG
MEREDITH B. HEALY
Trial Attorneys

JASON M. FRIERSON
United States Attorney

*/s/ Mina Chang*
MINA CHANG
Assistant United States Attorney